Good morning and welcome to this special sitting. We have one case this morning. It is Tate v. Warden, 24-10-834. And just a couple of rules of the road. Please most importantly know that we've read your materials. So we've read the briefs, the cases, the statutes, the record materials. So in the limited time you have before us, don't waste your time with factual and procedural ramp-up. Just get right to the core of your case. And two, the traffic light system, I think you'll understand. Green is go, yellow is slow, red is stop. I've never been very good at cutting people off in the middle of a syllable, but I would ask that you respect the court's time. So when you see the red light, go ahead and wrap up. With that, we'll call the case. We have Ms. Wells here for the appellant. Mr. Bergethon, get that right, good. For the appellee, Ms. Wells, you've reserved five minutes for rebuttal. You can proceed whenever you're ready. Good morning, Your Honor. Good morning. Nick Tate's case is remarkable because of the magnitude of abuse and trauma that he suffered as a child. Seven experts who examined him, every expert involved in the case, including the state's expert, agreed that it was the worst social history they'd ever seen. The habeas court found and the Georgia Supreme Court accepted as true that Nick's childhood was one of unrelenting trauma. As the courts found, there were regular beatings by both his father and his mother with fists and extension cords and belts. The mother had a punishment, which most of us would consider torture, where she would force the children to kneel on rice and hold their ankles nose to nose. At eight years old, Nick's 16-year-old brother anally raped him and molested Nick's sister. Later reports indicated this went on for over a year. Can I, I guess just for my purposes, I don't really doubt anything you're telling me or you're going to tell me about the hideousness of the mitigation, but it seems like it really, this case kind of boils down to Landergan for you, right? And I think you need, at least to me, to explain why the Georgia Supreme Court's application of the principles in that case to this record was unreasonable. Yes, Your Honor. There were two critical fact findings that the Georgia Supreme Court made that we would submit are erroneous. And the first was this inclusion of language that came from a motion that was errantly filed by counsel. The district court found, love it when I lose it the very first minute, counsel mistakenly filed a pretrial motion that had language from another case that the Once trial counsel discovered the error, he withdrew the motion. Nonetheless, discussion from that motion made its way into the state habeas corpus court's opinion, having been pasted there from a draft order prepared by respondent. And respondent has admitted that the language did not belong in the order. This is the language, this is the pivotal fact finding by the Georgia Supreme Court. They say this. They then go on to find that the habeas court failed to consider by the record, Your Honor. Post habeas hearing, the respondent and the defendant both submitted proposed orders. The habeas court, in making its final order, these were 113 pages. Coincidentally, both of them had these long proposed orders with lots of details. In the respondent's order for 20 pages, they talk about Landrigan error. When they're dealing with the penalty phase part of the case, their proposed order analyzes under Landrigan, just like the Georgia Supreme Court later did. The habeas court chooses stuff from the proposed order from the respondent from the guilt phase portion and actually chooses stuff from the respondent's proposed order from the later portion. They reject the Landrigan portion and instead adopt the argument that Strickland controls. There's no question, based on this record, that the habeas court did consider this under Landrigan. That's a fact finding by the Georgia Supreme Court. The Georgia Supreme Court says despite those findings, habeas court applied Strickland without also considering Landrigan or related cases. Can I ask you a question about that? Your point in response to Judge Newsom raises a question that I have about this case, which is if I were reviewing the Georgia Supreme Court's, you know, sort of the method that the Georgia Supreme Court used to review the state, I guess, state habeas court, I get a lot of the merits of the argument that you're saying, which is, you know, they kind of were, they gave it not, they weren't super careful in the way they described what the state habeas court was doing. But is that really what we're supposed to do? It seems like, it seems like what we're supposed to do is just treat this, this Georgia Supreme Court as having said something about federal law and then we're supposed to ask ourselves, is that thing unreasonable? Yes, your honor, that's true. But, and we would submit it's unreasonable because they're making fact findings that aren't supported by the record here. But what is, so what, okay, so that, I guess, and, and I, yeah, I think you're going to get plenty of time to, but how is that, how is your argument about the way they viewed the, the trial court's decision go to the, the question of fact findings? So, so the fact, it seems like the fact finding they made is that your client didn't want to present a mitigation case. Correct. Okay, so, so why would we look to their, the Georgia Supreme Court's review of the state court's judgment as opposed to just whether there's evidence in the record to support that fact finding? Well, the habeas court, as they noted, they, they, they can't just come in and, and replace the fact findings of the Georgia Supreme Court with their own. They've got to have a reason to do that. The Georgia, the state habeas court is the fact finder. They view the credibility of the witnesses. They listen to the evidence. They hear it all. And based on that, the state habeas court determined that Strickland was the appropriate law to be applied here. The habeas court, because this is a unique case. It's not as complicated as I believe we've made it. Because Strickland v. Washington is the appropriate case to analyze ineffective assistance with counsel. The Supreme Court says that all the time. They say it in Williams. Landergan adds another layer on, saying if the defendant precludes mitigation and that's why it doesn't get to the sentencer, that's the question in Landergan. If that's why it doesn't get to the sentencer, then it's not fair to basically hold trial counsel responsible for that, right? And, the habeas court had the opportunity to review all of this evidence. And it's such a fact finding issue, Landergan is. While it's a legal finding, it requires very strongly on the facts. And as the habeas court, as the Georgia Supreme Court accurately noted, even if portions of trial counsel's testimony appear somewhat at odds with other testimony evidence, it's for the habeas I don't think it was exactly responsive to the concern I have. It seems like your argument is kind of what it's asking us to do, is to decide whether the Georgia Supreme Court's application of the clearly erroneous standard is unreasonable. No, Your Honor. What we're arguing is that the Georgia Supreme Court applied the wrong law. The application of Landergan is contrary to the facts in this case. Okay. What are the facts in the record that you would say that if I were a judge in Georgia and I looked at this record and I said, you know, I think he waived his, I don't think he wanted to present a mitigation case, what makes, based on this record, what would make that an unreasonable fact finding? Well, I think the first one and the most obvious one is this fact finding, this purported fact finding that's in the guilt innocence portion of the habeas court's order. And this was taken from the respondent's, word for word, from the respondent's proposed order. And the respondent, as I just noted in the district court found, has agreed that that fact finding wasn't, it shouldn't have been there. Okay. So we've got a fact finding that everybody agrees shouldn't have been there. And it's the jumping off part for the habeas court, for the Georgia Supreme Court. Without that fact finding, I don't think there could have been any space where the made a finding that Landergan was the controlling law in this case. Is that right though? Didn't the district court here noted that that was a problem, right? That the state agrees is a problem, but then went through all of the additional evidence that the Supreme Court cited in support of that holding. To me, that improperly included evidence was not really even that fundamental to its decision. What's your response to that? Well, what the Georgia Supreme Court did, and the district court cited this, they would then go through and cherry pick statements from counsel. And Landergan is not about a client who's wavering. Landergan is not about a client who would tolerate mitigation. And, you know, these are statements from counsel at the habeas hearing. Did he, other than the Curtis stuff, this is a question, ever, they're talking to the lead attorney, ever object to you presenting or calling witnesses? Cella, no. Did he ever tell you not to talk to any of his family members, any of his friends? Cella, no. Were there any other witnesses, other than Curtis and mom, as far as mitigation investigation that Nick didn't want you to talk to? No. What other things did Mr. Tate limit you in presenting or investigating? Cella, I can't recall anything else that he specifically ordered me not to pursue. What was Mr. Tate's attitude about the presentation of mitigation, other than the Curtis stuff he talked about? Oh, he tolerated it. There is tension in the record. There are other statements, and they're recited in the order, where counsel are asked questions, and they make comments that are like, yeah, he didn't want us to do this. But at the end of the day, lead counsel was very clear that he was not told not to present other mitigation. And the record, as reviewed by the state habeas judge, and the state habeas judge was very active. He questioned these attorneys. He asked them questions about this. He was clearly paying attention. And the record supports the finding that the state habeas court found that the reason this information, it's not that Nick told him it couldn't go forward. Defense counsel didn't investigate this information and present it. What about co-counsel stated that he and the lead counsel, quote, were exasperated because they felt like they had a very strong mitigating case. The problem was that the petitioner took the position that he had committed a crime worthy of death, according to the Bible. And they tried to persuade him differently. I mean, it goes on, right? I think that the Supreme Court saw that as pretty powerful evidence. And can we really say that we as a federal court can overrule that finding? Well, the Supreme Court, and it's important to notice, co-counsel also said, so is it fair to say that those two witnesses, the two who actually were presented in sentencing, the petitioner would allow you, were the only ones the petitioner would allow you to call? And Reed says, I wouldn't agree with that. So there is tension in the testimony. I guess here's, this is my question. To say there is tension in the testimony, and then you just said a minute ago, the record supports the finding, or would support the finding of the state habeas court. But that's not where the state proceedings landed. In the Georgia Supreme Court, the Georgia Supreme Court sort of resolved these mixed bag, messy evidentiary issues against you. And it just seems like, to Judge Grant's question, unless we can say that that was an unreasonable determination of the facts, not wrong, but unreasonable, then you have a very steep hill to climb. So I don't think it's enough for you to say the record supports me. You have to say, like, the record conclusively supports me, and you'd have to be a fool to conclude otherwise, basically. And Your Honor, we believe that to be true. And it's not unlike Wiggins, where the state court based its conclusion in part on false evidence. And the United States Supreme Court said they based its conclusion in part on a clear factual error, and that is a D2 error, and doesn't require us to have deference. And it's important to talk about, too, Your Honor, what Landergan language, the language in the Landergan cases, where they find that Landergan, where you all and other courts find that Landergan applies, clear, the client's clear, consistently, adamantly, unmistakable, resolute, continuous and repeated, steadfast, that is not what occurred here. And so I think we do have to look at what the state habeas court judge did, because, you know, we've got a fact finding from the George Supreme Court that we know to not be true. The George Supreme Court says Landergan wasn't considered by the state habeas court. There's no question Landergan was considered, unless we're to believe that he didn't read the middle 20 pages of the state's proposed order. He considered it, he rejected it, he felt that Strickland was the appropriate law because it was. And so I think, I understand Your Honor's question, and I hope I'm answering it, but I think given this record, the application of Landergan is contrary to the United States Supreme Court. And while deference is due to the George Supreme Court, it's not the final question. I mean, deference doesn't apply abandonment of judicial review. You know, the Supreme Court talks about this in Miller L, as we know this Court is aware. And so I think in the unique facts of this case, and we've got a case unlike any that we could find, where first off you have a fact finding, not in the penalty part, in the guilt-innocence part, that doesn't support the habeas court's finding on penalty phase. So it doesn't, we know it shouldn't be there. We know it's erroneous. We know that it's not our client's language. It's actually from a case where a client killed the victims intentionally to get the death penalty. That's where the motion came from. And so the language made sense. And when, in the counsel, trial counsel, erroneously filed this. He had a bank of motions. He didn't look at them closely, I guess. He filed it. And in the habeas hearing, when it came up, he was like, I don't have that. Because what happened he was asking for a mitigation expert. And the state said, well, hang on. You say your client waives mitigation. And counsel says, I don't have that. And it's interesting to note the timing of that, because that's after Mr. Tate has already had this religious change of heart. And after, you know, there is a change in Mr. Tate's attitude. That's clear from the record. But even after that, counsel's saying, I don't have that. I don't have a client who's waiving mitigation. So I think what's happened by applying Landrigan to these facts, which are unique facts. So we've got first off that fact finding. And then we've got fact findings from the state habeas court that support in the penalty phase part, which are consistent with the habeas court's findings. The record, this is from the state habeas court. The record reflects that petitioner did not want trial counsel to discuss the rapes by Curtis at trial. And petitioner also did not want his mother to testify, because he did not want her subject to the district court's attorney. But the state habeas court didn't even cite Landrigan, right? But Your Honor, this court... No, I understand. But hold, but right? Yes, ma'am. Okay. So I think you have, I think there's a reasonable argument that you can make and do make that Landrigan shouldn't apply, at least with full force, because of some of the factual differences, right? But wouldn't you think it's certainly close enough that if I were the state Supreme Court, I would expect the state habeas court to at least, at least discuss it and say why it didn't apply if that court were actually considering the case? I find it very surprising that the state habeas court didn't even say, well, the state says Landrigan, but here's why not. So can we say it's unreasonable for the Georgia Supreme Court to conclude from that, that the state habeas court entirely overlooked Landrigan? Absolutely, Your Honor. I think if Your Honor looks at the proposed orders and how the court block quotes portions from the proposed orders, the idea that the court didn't consider Landrigan is unrealistic. And this court has said in other contexts, and I'm having trouble finding the name of the cases right now, but I believe they're cited in our brief, that you don't have to cite it to show that you, the courts do not have to cite information to show that they've considered it. You know, we presume. What evidence is there that the court considered it? That the court is reading these two proposed orders and has taken, I mean, I just think it's. I mean, I don't think that you would say if the court hadn't mentioned any of the horrific abuse that your client suffered, that the court had obviously considered it because it had read the that. But we do say that we frequently say that in cases going that the court failed to mention this. And we're frequently told we assume the court, the presumption is the court does. And I don't, I mentioned this one small thing, right? I do think it'd be different if the court just didn't say anything at all about the abuse in a case like this, right? Right. And so it still seems surprising to me for the court not to say anything at all about Landrigan. Your Honor, if there's a question about what the court's reasoning was for not citing Landrigan, perhaps the appropriate thing would be to remand back to the district court. I believe it is an unrealistic view of the record to make the argument that the court did not consider Landrigan when it was argued to him. The court didn't, there are plenty of cases, and I get that Landrigan is a key case, but assuming you're the court and you think it's so far out of the Landrigan world that you don't feel the need to cite it. And perhaps that's where the court was because he had heard the evidence. He had reviewed. That would be a surprising conclusion, I think. Probably. I think so too, Your Honor. And yes, do I wish the court cited Landrigan? Absolutely. But they didn't. And I don't think, but I just think it's so unrealistic to say that this court reviewed these records, saw the arguments that are made, and it's both in the respondent's brief and 20 pages of the proposed order talks about, you know, there's even a portion of the proposed order in the state's proposed order, I believe, that says client precluded mitigation. Yeah, so the citing of Landrigan, like I'm having a difficult time conceptually understanding how that matters to our review of what the Georgia Supreme Court did. Can you explain that to me? And the reason, like, let's just say the Georgia Supreme Court said, we're the Georgia Supreme Court. As a matter of Georgia law, or just as a matter of being a Supreme Court, or as a matter of being an appellate court, we hereby presume that if a case is not cited by a lower court, it was not considered by the lower court. Like, how would that matter to our review of the federal issues in the case? I think it matters to review of the federal issues because two of the fact findings found by the Georgia Supreme Court were this, that this is a pivotal, you know, they say. So you think this is a fact finding that they made? They found as a matter of fact that Landrigan was not considered? Yes, your honor. This is the language. That seems odd to me. Like, I don't, I don't make fact findings about, like, the true subjective consideration of, like, like, I don't, like, read a district court's opinion and say, like, as a matter of fact, the district court was, like, happy about this or sad or was lying or whatever. Like, these are not fact findings that one makes when one reads a lower court opinion. It's just like, I read the opinion and this is my take on the opinion. It seems odd. Yeah, and I agree with you, and there's a lot of odd stuff about this case. I think in a normal case, I, too, didn't initially read it as a fact finding, and then when you start looking at the record, they just, it's, I think it's critical to their And I think if we argue that it's not, we're, we're ignoring the record because they say two things. They say the warden is correct that there is a conflict between the habeas court's factual findings and its legal analysis, in particular, in its order, and then it cites the portion that shouldn't have been in there. And they say, despite those findings, habeas court applied Strickland without also considering Landrigan. I think those are key parts and key fact findings. But isn't that saying the legal, an important legal aspect of this case is Landrigan, and the court didn't deal with that, and so now we do, and we find that it governs in this particular way. Okay, yes, Your Honor. Even if we, even if, I can see I'm making no headway on the argument that it's a fact finding, and it's not critical to the court providing deference and review, not giving no deference. Yeah, I mean, I think, I think that, I mean, just to go back to my kind of sort of original line of questioning, I mean, I think you've identified some, like, problems in the Georgia Supreme Court's opinion, like, as an appellate court reviewing a lower court. I'm, I'm having a, I continue to have sort of conceptual difficulty of linking up those problems to our review of the Georgia Supreme Court, like, as a court that's resolved a federal issue. Well, Your Honor, our, I think the main issue here is that the Georgia Supreme Court applied law that was contrary to the facts in this case. Landrigan is not the case, and I think if the court, when the court reviews the Landrigan cases and looks at the difference, particularly, and this is unique because we do have, and I know going back to the state habeas court order is troubling, but we do have a court who is charged with the fact finding, who is charged with reviewing the credibility of witnesses, and a lot of the facts here come down to weighing what the attorneys are saying and listening to the record, and it's important to see in this record that the, the attorneys didn't do any investigation. You know, there's, there's, like, huge amount of mitigation that they simply didn't discover, and that, I think, is important to look at, but I think if you look at the language in, you know, consistently, unmistakable, resolute, the evidence here is not of that. We have Mr. Tate, here's evidence that's in the record that Mr. Tate was okay with mitigation going forward. He asked counsel to obtain his mental health in jail records. He, during trial, says to the counsel, he writes a note saying, where are my records? That's an unusual thing for clients to be that involved, quite honestly. His repeated statements to the court at pretrial hearings, a month before trial, that he's happy with his attorneys. His statement with, to Dr. Richards, that he's happy with his attorneys, but it's not, and it's not his place to decide how things will turn out. Did he hope for a death sentence? Yes, but he was very clear to the court, and there is a finding in the Georgia Supreme Court that's not accurate, where it says that trial counsel, in closing, stated that Nick Tate wanted death. Actually, trial counsel said just the opposite. Trial counsel says he believes he deserves death, but he doesn't say he wants death. But I would submit that's irrelevant, because his actions, Nick's actions, witness the rape actually was put in, and as Mr. Reed, the counsel, Mr. Reed testified, he approved that. Nick approved that, despite this tension. This is a very mentally ill young man. We know this to be true. I do want to mention one other thing, because the District Court and the Georgia Supreme Court both rely on these language post-trial at the motion for new trial, and we've argued many reasons why that shouldn't come in, but one thing I think that is also important that I don't think we put in our brief, is a couple of years after trial, and before the status hearing, where he made this purported comment about mitigation, Nick filed a motion for appointment of counsel, a pro se motion for appointment of counsel, because he had not seen trial counsel or appellate counsel at all, and in it he says, I want that so I can raise IAC. That's not consistent with wanting death. That's not consistent with not wanting mitigation. So if we're looking at post-trial statements, that has to be taken into account as well. Nick approved of his submission of Curtis's conviction for molesting him. A month before trial, counsel discussed putting sentencing phase witnesses on call and affirmed he would be prepared, and Nick didn't say anything. He doesn't contest. At no point does he say to the court, I don't want this put forward, and his actual words, it's very important to look at, are, this is up to you, your honor, when at one point after his death sentence, and it may have been at the motion for new trial hearing, he says to the judge, I didn't do this. You did this. I didn't do the death sentence. So it's part of his belief system that because of his remorse and his guilt, he believes he deserves to be punished, but that is not the same. That is not even close to the same as what Landergan holds, and I think to apply that in this case would be contrary to established Supreme Court law. Okay, very well. I'm out of time. Thank you. You've got five minutes of rebuttal time coming to you. Thank you, your honor. Let's hear from the state. Good morning, your honors. Your honor's questions this morning have really kind of put your finger on the main problem here, and that's we're in Edpa land, and so my friends on the other side have done a very able job of pointing out any sort of tensions in the record that they can find, but ultimately the question is just whether any reasonable jurist could have held as the Georgia Supreme Court did that Landergan controlled in light of this record, and I think the answer to that is clearly yes, and I want to just give a few examples I think that show the main problem with the petitioner's arguments throughout. They've made these broad assertions that this was basically just sort of a Scrivener's error, that a fact found its way into the court's opinion that the court relied on. They're saying now, you know, for example, Bullitt pointed in their brief, Nick did not ask counsel to speak to other family members or friends. The actual exchange there was did he ever tell you not to talk to any of his family members, any of his friends? His counsel's response was no. As I said, we were able to talk through the whole thing. We just couldn't overcome our disagreement about what his goal should be. I just couldn't get through to him. It always came down to the Old Testament. Same thing on whether he told counsel not to investigate. The Bullitt point in the brief says just that. He told them not to investigate, but counsel says on the next page, by the time we got to trial, Nick wanted the death penalty. He didn't want me to even try to save his life. Counsel has asked, did you have problems communicating with him? Yes, at the end, because he wanted the death penalty. So, there might be things in the record viewed in isolation that go the other way. That's just not how ETFA review works, Your Honors. I do want to push back on one assertion that my friend made. The state hasn't conceded that this factual finding in the state habeas courts order was incorrect, that it was erroneous. We've conceded that the citation was incorrect, and the Georgia Supreme Court dealt with this argument that, hey, you're just relying on what is essentially a error. They dealt with it by saying, well, look, here's 10 pages of evidence of why it's not. Other things you can rely on. But I just want to make clear that we're not saying that that factual, what is essentially kind of a factual summary, that he didn't want mitigation evidence. Absolutely, we think that's what the record shows. And the idea that we're backing off and saying, no, that's wrong, that he actually did want mitigation evidence. And that's absolutely not true, and the record just doesn't support that. Do you know how that incorrect, I know you're saying it's thematically correct, but that incorrect statement got into the proposed order? My understanding is that the habeas courts ultimate order was kind of a collection of, it was an aggregation of the two sides' proposed orders. And I think that in our order, there was, in our proposed order, there was a mistaken citation. And so we've never tried to say that that citation wasn't a mistake. And I think the courts below have addressed that. But again, it would be one thing if we were in just sort of your mine run death penalty case, and all of a coming in that says, oh, he didn't want to mitigate, and that was it. That's coming in against the backdrop of him saying from his guilty plea, through sentencing, through afterwards, I want the death penalty. And there's an important distinction. And I understand why my friends try to frame it as just, he felt like he deserved the death penalty. And there's some daylight between those concepts. You can feel like you deserve the death penalty, but you're still going to let your defense go forward. That's not what we have here. We have Tate saying again and again, directly, expressly to the judge, I want the death penalty. He said, I know you can give me whatever you want, but this is what I want. So ultimately, the question here obviously is, you know, just could any fair-minded jurist, based on this record, which includes all the pages of evidence that the Georgia Supreme Court pointed to, could you look at that and say, we think that this is a Landrigan case? I mean, 10 judges have done that so far. That's a pretty good indication that it is not a conclusion that any fair-minded jurist could reach. Could you address sort of the theoretical question that I'm grappling with, which is, so it looks like the Georgia Supreme Court, let's just say for the purposes of addressing this, that we'll just concede that the Georgia Supreme Court made some errors in the way it sort of applied the clearly erroneous standard to the lower court's fact findings. What are we supposed to do with that as a matter of a federal court reviewing what the Georgia Supreme Court said? So it depends. If it's just the Georgia Supreme Court saying, this is not how we do this in Georgia, this is not how, you know, we handle evidence, that's the Georgia Supreme Court's ultimate call, and it's irrelevant to the court's review. The court's editor review is just based on the record that was before the state courts. Was this an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts? So I think you've kind of highlighted an issue with this, that a lot of the dispute that you heard so far in the argument was more on kind of the intra-state court handling of, you know, the evidence versus the ultimate question. As I understand Petitioner's case, it really does depend on whether Landrigan applies. They don't even really try to argue why they would win otherwise. So, I mean, here's a question on the same line. So the standard we're applying is unreasonable determination of the facts, right? Is baked into the unreasonable determination of the facts the standard that the state court is applying? So the way this would work is the Georgia Supreme Court is applying a standard that's, the question here is whether the trial court made it clearly erroneous fact-finding. And so for us to say that the Georgia Supreme Court's fact-findings were unreasonable, we have to sort of bake in that standard and say, was it an unreasonable application of the clearly erroneous standard by an appellate court? Or is that not the way it works? If I understand your question correctly, I think there may be some overlap in the question of, you know, sort of just state court, how do state courts address their appellate process and how they're reviewing things and the epic consideration in the sense that, you know, if you have a state Supreme Court saying, yes, the record shows this, but we, you know, we have a, we've determined that the state rule is, we won't consider any of it. Yes, they're the ultimate say on what happens on the state side of things, but that still could be an unreasonable determination of the facts, I think, for AEDPA purposes. I'm not, I'm not sure if I'm getting at. Yeah, I think I understand where you're, like, so let me give you another hypothetical that sort of takes the appellate review out of it. I mean, let's say that the state court's standard, for whatever reason, is for habeas in state court, you have to prove everything beyond a reasonable doubt. When we're reviewing whether the state court made an unreasonable determination of facts as a matter of AEDPA, do we ask, did the state court make an unreasonable determination of the facts in applying the standard that it was applying? Or do we just, do we not care what the standard was that they were applying to make those facts? That make sense? I have not seen anything, and I don't want to firmly commit to this because I might just be wrong. I have not seen federal law saying that that analysis is shaped entirely by the state court standard of review. But I, my percentage of certainty in that is not high. Yeah, I mean, is it, I mean, and I think, I think you're right that that doesn't exist. You know, may, may, even after this case, may still not exist. But just one more sort of question along these lines. So, let's just assume that, I think, as a matter of practice, no one ever looks at that, right? Is that because AEDPA imposes its like own standard that we're supposed to look at to determine whether the facts, you know what I'm saying? Like, so no matter what the state court did, whether they applied like a clearly convincing evidence standard or a, you know, just a 50% standard or whatever, that we just, we don't care what they were applying because we just have to apply our own standard? I think that's probably right. I mean, the court spoke to this in Pi, it's en banc case a few weeks ago, sorry, a few years ago. And it said, I mean, there is an AEDPA standard on, or at least a federal court standard on, on whether a factual determination is unreasonable. And it's, it's two steps. The petitioner's burden to show that the fact finding was wrong by clear and convincing evidence. And two, then there's a second step, which is, I think, getting lost in this case, which is whether that the state court's decision taken as a whole constitutes an unreasonable determination of the facts. And what the court meant by that was that depending on the importance of the factual error to the state court's ultimate decision, the decision might still be reasonable, even if some of the state court's individual factual findings were erroneous. So the short answer, I think, Judge Brasher, is, is there's this clear and convincing evidence built in. And, you know, thinking more about your question, it might be hard to reconcile that with some state court decision that, you know, jacks up the standard of proof. Again, you know, to be clear, we don't think we're near any of that here, or that it poses any problem here with this case, because honestly, even if we were proceeding outside of AEDPA and just in traditional Strickland land, I mean, that is so deferential. And the amount of evidence here is just overwhelming that the petitioner was steadfast from beginning to end, that he wanted the death penalty. He didn't want counsel to look into all of this other stuff. He's maintained that afterwards. I mean, he's tried to withdraw the habeas petition and, you know, didn't want a motion for new trial. Unlike the defendant in Landrigan, who had a last-minute change of heart and said, oh, no, actually, you know, I did want that, Tate has remained consistent. And so, the, in any record, there are going to be some things in the evidence or in the testimony that you can point to and say, that's not consistent. And again, Tate's counsel has done an admirable job of finding those and highlighting those. But just in the broader scheme of the record, that doesn't do the work they need to get them past the AEDPA standard of unreasonable application, meaning no fair-minded jurist could disagree. If the court has any other questions, I'm happy to address them. Is the state arguing or not arguing for procedural default on the second question? I didn't see anything about it in your brief. It was procedurally defaulted. I think what we said in our brief was that the court can address the merits. The court can just say that it was procedurally defaulted, though, because the Georgia Supreme Court was clear about that, that it was an adequate, that was an adequate and independent state ground. Did I miss you really analyzing that in the brief? I think we said it maybe in the first sentence of that. So, in that case, then, no, I did not miss you really analyzing it in the brief, right? If there's one sentence about it. Oh, no, and to be, I wasn't involved in the briefing on this, so that's why I'm not recalling it quickly. But so, but the answer to that, I'm happy to address it now. The Georgia Supreme Court said, A, this is procedurally defaulted, and B, it couldn't win on the merits anyway. I mean, on that question, the court, the court really has four options. There are four reasons that that claim just as a just absolute matter fails. The first is procedural default. I'm sorry to drill down on this, but can the state forfeit procedural default? I think that's probably what I would argue if I were your friends on the other side. If the state, I don't, I don't know the answer to, I don't think that the state courts can say it's a matter of that it's procedurally defaulted, and you don't emphasize it enough in your brief. But again, I don't know the particular answer to that. The bottom line here is, if the court thinks that, that's fine. We're, if the court wants to proceed on the merits, there are three very good reasons why that claim just is a non-starter. The first is that the court has already said, facing this exact claim, that, that there is no clearly established Supreme Court precedent on this. So, I mean, that's the end of matters for AEDPA for unreasonable application. Even setting AEDPA aside, the court has said in its own, in its own precedent that where the evidence is unclear, that introducing inconsistent theories poses no due process problem. But even setting that aside, the state, the sentencing court just ultimately didn't buy this. In its findings at the end, it said, you know, the prosecutor had argued maybe Tate actually did this. That's not what the state court said at sentencing. The state court said, you know, he, he committed one murder. He directed and was involved in the other that Chad did. So setting all of that aside, there cannot be prejudice because this is just a court doing the sentencing. It's not a juror, a jury whose passions could be inflamed. It's a court who tell, who told us what it did, and it didn't buy this theory. So I think for all of those three reasons, it's a non-starter. But I, I do think the court could still say, if it wanted to, that, that this is procedurally defaulted. Thanks. We'll look at that. I'll encourage the state, whoever's drafting the brief, to be more attentive about including all the arguments that the state wishes for us to consider. For sure, Your Honor. I'll convey that. Thank you. Thank you, Your Honors. Okay. Very well. All right, Ms. Wells, we've got five minutes remaining.  Thank you. Judge Grant, to address your question first of how this got into the state's order and the proposed, the actual site is the, in the proposed order, the state says, following these attempts to negotiate a plea, this is on page 94.15 is the document, page 53. Following these attempts to negotiating a plea, the record shows that, and this is the part that comes from that motion, that erroneously filed motion. Petitioner expressed a desire to plead guilty, did not want trial counsel to present mitigation evidence, and wanted to receive the death penalty. Motion's hearing transcript, pages 31 and 32. What's left out there, and what's key that's left out, is this motion was withdrawn. And actually, if you look at pages 31 and 32, it also, those pages don't include the part where it's withdrawn. They include some other language about it. But I think if, if Your Honor is concerned about that, really looking at the record will make it clear how it got in. This is in a guilt innocence portion of the proposed order. It has nothing to do with penalty phase. It's easy to see how the judge could have not realized that, oh wait, this was the thing that was withdrawn. It's a mistake. No question it's a mistake. But, but I think the more important thing on it is, it's in the guilt innocence portion. When the judge is doing the sentencing phase analysis, the fact findings he makes with respect to what didn't happen, is Curtis didn't, he didn't want Curtis to testify, and he didn't want his mother to testify, because he didn't want to put her through it. And I think those are very important. The question about whether no reasonable jurist could hold that Lander could control in light of this record, where the court defined that, you know, this, this goes to the idea that we, because 10 judges have evaluated this, that's the end story. If that were true, we would grant deference to every state habeas thing, right? So I think that's a a no-win question. Can I ask you one question? What I'm not asking you to do is to divulge any attorney-client privileged information. But, so like for instance, your friend on the other side said, this is not one of these cases where it's clear that the defendant had like a change of heart after initially trying to preclude the introduction of mitigating evidence. And also in their briefs, the state says several times, parenthetically, sort of like Tate now, parentheses, or his lawyers, close parentheses, sort of like want to sort of press this argument. Does Tate himself now want to press this argument? I've never met him. So to begin with, I can't say. But I can tell you that what counsel said is not entirely correct. And the record is very clear on that. Mr. Tate has gone back and forth. He has wavered. And I think that's very clear. You know, the thing where he wants to raise IEC. Mr. Tate knows how to write to the court. He knows that this argument is being had. He knows what we are arguing. The briefs have been discussed with him. I know all of that to be true. So to argue that he is not okay with it, I am comfortable that if this court grants the sentencing that I think he deserves and is appropriate in this case, he will happily take that. Happily may be a big statement. I don't know. I haven't met him. But I do not have concerns that that is not a position he's comfortable with. And I don't think it's the correct inquiry because, you know, in Landergan, when Landergan came back later and said, hey, I got a new idea. I don't want to do it. The court said, we don't care what you want to do now. What's important is what happened. Why did this information not make it to the sentencer? And this is, you know, I can't overstress how egregious the trauma was in this case. I mean, it is unique. I've done this work for over 30 years. This is as bad as it gets. And to not give that to the judge in a case where Mr. Tate was offered a life plea. His brothers both got life pleas. The brother who actually killed Caitlin got a life plea parolable at 17 years. He's parole eligible. The brother, the other brother got a life plea parolable at 22 years. The initial plea offered to Mr. Tate did not have a sentence in it. It was, the judge was going to be allowed to determine the sentence. It could go up to life without parole. So this is, while it's a horrific crime, the state recognized there were many factors involved in this that made it where a life sentence is appropriate. And this all information that the habeas judge considered when determining that Strickland was appropriate. But I think the most important thing is... I want to make sure I understand. You just said that he was offered a life sentence, right? Yes, ma'am. He was. Why wouldn't the fact that he turned that down support the argument that he actually did want the death sentence at that time? The evidence is from counsel who testified that the reason he turned it down was twofold, because his mother talked him out of it. And that's also in the mental health records. He makes an indicate, that's indicated in mental health records. And also because at that time he didn't choose, he was adamant that he did not molest Caitlin. He ultimately did plea to that because that was the only plea on the table. Okay, very well. Thank you both. Case is submitted and the court is adjourned.